Tucker, P.
Upon mature consideration of this case, and of the very able argument on both sides, I regret to be compelled to give my judgment in favour of the appellees: I regret it because it is certainly a case of some hardship on the appellants, and those for whom their testator was the surety, since the appellees, by this decision, will get both the newly erected building and the whole of the insurance money which was paid for that which was consumed.
At the very first step in this investigation, we are met by the decree of June 1S14. That decree I consider as conclusive of the rights of the parties to it, and, whether right or wrong, decisive of the questions *550 now again brought before the court. The bill filed by Haxall and wife sets forth the burning of the mansion house, their purpose to rebuild it with the insurance / money, and the refusal of the Mutual Assurance Society to pay it to them, and prays a decree that the money should be paid to them for that purpose. The decree simply orders a payment of the whole insurance money to the plaintiffs, declaring mrs. HaxalVs right “to the use of the money in like manner as she would have been entitled to the use of the house itself;” that is, to the uncontrolled use of it (the money) during her life, but to be paid over to those in remainder at her death. It gave no authority to rebuild at the charge of the daughters, nor did it limit the life owner in the manner of using the fund. She had the absolute use of it during her life, and was not bound or required to use it in rebuilding. It might have been employed in trade or speculation, and the parties in remainder could not, after that decree, have arrested such an employment of the capital. All their right was to have it /eturned at the expiration of the life estate. Such was obviously the effect of the decree ; and, accordingly, the plaintiffs were required to give bond, before they should have the benefit of it, to the two daughters for the payment of the principal money immediately upon the death of the mother. The plaintiffs seem to have hesitated. The court had disapproved the idea of the assurers, which confined mrs. Haxall to the interest, since in that mode she did, not enjoy the money as she was entitled to enjoy the house. The use of the money was not necessarily measured by the interest, and, therefore, the money itself was decreed to her and her husband for her life, the repayment being secured by bond; and thus she would truly enjoy the money as she would have enjoyed the use of the house. Yet for nearly two years the plaintiffs delayed giving the bond. At length, they did give it, conformably to the decree, *551 which after such a lapse of time must have been well understood, and by entering into the obligation under it, they assented to, ratified and confirmed it, and made themselves absolutely debtors to the devisees in remainder for the whole insurance money at the mother’s death. Had the chancellor designed to sanction the rebuilding at the children’s expense, the decree and the bond would have been in the alternative, either to rebuild, or, on failure to do so, then to refund. But the decree is absolute, that they shall have the use of the money for life, and that the daughters shall have the money at the mother’s death. This decree is unassailable. The plaintiffs, having acquiesced in it, and indeed acted under it, cannot gainsay it, or vacate, or modify, the bond given under it. To say that the daughters shall not have the money, but shall have the buildings in satisfaction of it, is to contradict the bond. To contradict the bond, which follows the decree, is to controvert the decree; and this cannot now be done even by appeal, and much less when thus assailed collaterally only. That decree, therefore, I conceive, is conclusive upon the question of the plaintiffs’ claim to have the money for the purpose of rebuilding at the joint charge of the life owner and those in remainder.
I am, however, clearly of opinion, that that decree was right. Conceding that the covenant of assurance, being with the covenantee, his heirs and assigns, enured to the benefit of all who had any title in the premises, in proportion to their respective interests; conceding that the tenant for life is not chargeable for waste and for the value of the building, according to the doctrines ' anterior to the statute 6 Ann. ch. 31. 1 Wms. Saund. 3235. 7 Bac. Abr. Waste. C. p. 256. and waiving the question how their respective proportions are to be ascertained ; still it is obvious, that the tenant for life could have no superior right over those in remainder, to the disposition of the insurance money. Unless *552 there was an equity, as is contended, that the money paid for the building that was burned should go to rebuild it, as that was the purpose for which it was deslined (a question to be presently examined), it seems undeniable, that mrs. Haxall could have no right to insist, that a fund in which her daughters were equally interested, should be invested in any manner without their assent or against their wishes. Being entitled to its use for life, indeed, she might have used it during life as she pleased, but she could have no right so to use it as to affect or impair their right to the use of the money itself after her death. Unless all therefore concurred in this conversion of personalty into realty, neither could so convert it. There was, then, no power in Haxall and wife to make the conversion without the assent of the daughters. But they were infants and could not assent. Moreover, Shippers marriage, at least, was prior to the rebuilding. Immediately upon his marriage, his marital rights to a moiety of this fund as money attached. It wras, indeed, but a chose in action ; but still it would become his, upon his reducing it into possession, and it has now become absolutely his by the judgment upon the bond, which he may enforce in his own right and not as administrator of his wife. What right, then, had the tenant for life, without his assent, to convert this money, which would belong to him as personalty, into real estate to which he would have no title whatever, unless he had a child, and then only the title of a tenant by the curtesy? The law recognizes no such power in one person, to dispose of and change and annihilate the rights of others. And here, if the fund continues money, Shippen is entitled to four or five thousand dollars ,* but if the conversion of the money into land is recognized, he may not have title to any thing; for non constat that he would be even tenant by the curtesy.
*553 That I have not assumed too much in asserting the ' husband’s right to the insurance money, may be safely affirmed. Though it be a covenant real for upholding the estate, yet if the insurers refuse payment, the action against them is for damages, and damages only can be recovered. It is truly said by vicechancellor Leach in Noble v. Cass, that with respect to injuries to land for which damages are to be recovered in a personal action, the person who brings the action is entitled to the damages; and, accordingly, he jield, that the damages recovered for a breach of a covenant running with the land belonged to the person who recovered them, and are not to be considered as part of the inheritance. Now on this covenant of insurance, the wife could not sue alone. Her husband must join even in actions relating to her real property; 1 Bac. Abr. Baron and Feme. K. p. 499. 1 Chitt. Plead. 17. and if he recovers damages, they at once become his absolutely ; he puts them in his own pocket without accountability to any. This occurs in various instances, seemingly of the greatest hardship. It happens even in those cases where the damages which thus become his, are retribution for realty which never could have become his, and where the apparent relation between the damages and the reparation of the estate would seem plain and palpable. Thus, if he sues upon a covenant of seisin, in which the value of the estate may be the measure of damages, those damages are not applied to purchase a new estate for the wife, but they become his own. The wife loses her real estate, and the husband pockets its value. So, in an action on a covenant for quiet enjoyment, or of warranty, or for renewal of a lease, the wife’s retribution for her real estate goes into her husband’s hands. So in action on a covenant to repair or to rebuild, the damages assessed must be adequate to repairing or rebuilding *554 the premises, Shortridge v. Lamplugh, Ld. Raym. 798. yet these damages the husband recovers, and there is no equity to compel him to lay out the money in repairing or rebuilding his wife’s houses. “ A court of equity” (says the vicechancellor, in Noble v. Cass), “ never holds that damages are any thing but the personal estate of the person who recovers them, and I should be introducing a new equity if I were to hold the damages recovered for breach of covenant running with the land, to be a part of the inheritance.”
Upon these principles then, this court must consider the money due by the insurance society, for which the decree was rendered in June 1814, as a chose in action, which Shippen became entitled to on his marriage, and which upon the death of the widow he would have been entitled to demand by suit, if its payment had not been secured by bond. Upon these principles too, the court in 1814 was right in considering this money as personal estate of the infants, and to be secured to them as such. The bond by which it was secured became, as to a moiety, the property of Shippen, as soon as he married, and he has since made it absolutely his own by recovering a judgment upon it. The other moiety, in like manner, belonged to Gilliam.
In this view of the case, it is manifest that the tenant for life could not lawfully deprive the appellee Shippen of his marital right to sue for this money (to which, when recovered, he would have absolute right) by converting it into realty, to which he would have no title. And this furnishes a sufficient answer to the idea, that the case resembles the payment of a debt by a gift or legacy: for, in those cases, the gift or legacy may not only be rejected by the party, but it goes to him who is in fact the creditor. But here, the supposed gift of the buildings is to the owners of the realty, instead of the husbands who are entitled to the money. The gift, therefore, does not enure to the owners of the debt.
*555 Unless, therefore, it can be shewn that the insurance money ought to be applied to the purpose for which it is said to be destined, there would seem to be little • • foundation for the pretensions of the appellees. Let us then enquire how stands the law in this regard. The position seems to me to be a misapprehension of the law of insurances against fire. In the case of Vivian v. Champion, 1 Salk. 141. 2 Ld. Raym. 1125. lord Holt indeed observed, in relation to damages recovered from a tenant for 99 years on a covenant to repair, that the damages should be sufficient to put the premises in repair, and the plaintiff ought in justice to apply them to that purpose. How he was to be compelled to do so, and whether the obligation was to be held to be perfect or imperfect, does not appear. But admitting it to be perfect, there are strong reasons for compelling such an application of the money in the case of a tenant who is bound for rent to his landlord, and who seems therefore equitably entitled to have the benefit of the damages to put the property in the stipulated state of repair. But as to policies of insurance, they are considered as distinct, independent contracts between the insurers and the insured. If the covenant does not name the heirs, the executors of the insured, and not the heirs, will be entitled to the proceeds of the policy, and those proceeds will go to pay debts, instead of being applied to rebuild houses; Ellis on Insurance, 84, 5. “ As a general rule,” says mr. Hovenden in his note on Mildmay v. Folgham, 1 Hovend. Supp. 305. “ policies of insurance are not attached to the realty, nor do they in any manner go with the same as incident thereto, by any conveyance or assignment;” citing Lynch v. Dalzell, 4 Bro. P. C. 431. Accordingly, in the case of Mildmay v. Folgham, 3 Ves. 471. where the policy was made payable to the insured, her executors, administrators and assigns, the lord chancellor refused to make the executor a trustee for the heir. Where however, as in *556 our insurances, the policy binds the insurers to pay to the insured, his heirs &c. the policy must be considered, I conceive, as a covenant real, of which the heir, and not the executor, must have the benefit. Still it does noi f°H°w> that when the money is paid to the heir, he is bound to lay it out in rebuilding: and if, as usually happens, there are several heirs, it is not perceived that either has a right to insist that the others shall unite with him in rebuilding the premises. The insurance is a compensation for a loss, and when that compensation is paid, it is money in the hands of the assured, of which they may dispose at pleasure. The law of contribution has no application to the case. That law has strict application, indeed, where property held in common needs repair: for there, it is in existence, and each has a right to keep it in existence, and to make all essential repairs at the joint expense of all. But where the buildings on an estate are destroyed, the question is one, not of repair of what exists and is held in common, but of building out and out. And as one tenant in common cannot compel another to build on their vacant lot, howmver it may be to their advantage, so one heir cannot compel the others to rebuild a house that has been destroyed. Still less can the tenant fpr life; for between him and the remainderman there is no community of interest. On the contrary, their interests are conflicting; for if the remainderman is compelled to spend his money in rebuilding, peradventure the life owner may live till it falls into decay and becomes useless; or it may again be consumed by fire, and then he will have no retribution. Accordingly, as between tenant and landlord, the landlord who receives insurance money cannot be compelled to rebuild, nor indeed is he even compellable to repair, but that duty, to a certain extent, rests upon the tenant. See Ellis on Ins. 82. Leeds v. Cheetham, 1 Sim. 146. In the case at bar, it must be conceded, that however ruinous the *557 buildings might have become, the tenant for life could have demanded no aid for repairs, but would have been bound at her own expense to keep the property in repair. By what right, then, could she demand that the devisees in remainder should expend their funds in rebuilding the premises out and out ? And a fortiori, by what right could she demand, after the marital rights attached, that the husband should expend what had become his funds, in rebuilding a house which never might become his ?
Much reliance was placed on the case of Norris v. Harrison, 2 Madd. Ch. Rep. 268. The various reasons for that decision are so thrown together by vice-chancellor Plumer, that it is difficult to extract any distinct principle applicable to this case from his opinion. There are some expressions which seem to indicate the idea, that the insurance money ought of right to be employed in rebuilding, and the court repelled the claim of the remainderman to that portion of it which had been so employed, since it had been “ laid out on the estate for the very purpose to which it was originally destined.” Yet, in deciding upon the right to the unexpended balance of the insurance fund, he rests so strongly on the intention of the testator W. Bells will, as to induce the belief that upon that intention depended the character of the fund, as real or personal. I think, however, upon the whole, that there is sufficient evidence that the vicechancellor did look upon the fund as one properly devoted to rebuilding the premises, or to the erection of some other equivalent building on the estate. But in the subsequent case of Nolle v. Cass, vicechancellor Leach did not consider his predecessor as settling any such general principle, but as deciding the case upon the acts of the party and the particular expressions in the will. If the case of Norris v. Harrison does determine that the insurance money must be applied to rebuilding the premi *558 ses, then I can only say that I cannot acquiesce in any such opinion. The covenant does indeed run with the land, and enure to the benefit of all who have title to the estate, according to their respective interests. But the damages (or insurance money) when recovered, are not to be considered as part of the inheritance. They are a sum in gross, belonging to the parties according to their respective interests. There is no authority for the principle, that an equity attaches to the damages recovered at law, to give them the particular destination of rebuilding the premises for the loss of which they were recovered. Such a doctrine would, be unreasonable and difficult of execution; unreasonable, because it might well be to the interest of the reversioner that the houses should not be rebuilt, either because of the depreciation of the property or for other causes; difficult of execution, because one party might oppose a rebuilding according to the former fashion, and the other insist upon it, and, in case of difference, the court must interfere to settle and adjust these vexatious disputes, involving petty details, embarrassing and unworthy of the tribunals of justice.
The notion, indeed, of an equity attaching to the insurance money, is wholly without foundation. There is no covenant even of the society to rebuild : it has no right to rebuild : it must pay the amount of the policy : and when so paid to the insured himself, he may do as he pleases with the money. There is nothing to bind him to rebuild. And if he gives, the property to A. for life, remainder to B. he does not give to either any right to demand the concurrence of the other in rebuilding the premises. As assignees, each has a right to benefit in the covenant proportioned to his interest, and each has his distinct action at law. Attersoll v. Stevens, 1 Taunt. 183. Perhaps there is no method better adapted to effect the ends of justice, than, through a court of equity, to decree the whole money *559 to the tenant for life for his use during life, taking care to secure repayment to the remainderman upon the tenant’s death. This is the course ■which the chancellor pursued in 1814, and which, upon the whole, I think is to be approved. 1A
_ It remains but to say, that I think the tenants for life cannot be sustained in their gratuitous act, by the allegation that the parties stood by and did not warn them against proceeding. It has been well said, that the decree itself was a warning; the bond was a warning ; and non constat, that notice was ever given to those in remainder, that an attempt would be made to charge them. They had no right or reason to suppose, after that decree, and while they held the absolute bond for repayment, that the tenants for life were building at their charge. They had therefore no reason for. interfering with the proceeding ,* for if the tenants chose to rebuild at their own expense, there was no one who could gainsay it.
Brooke and Cabell, J. concurred.